UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CHARLES RAMSEY COMPANY, INC.,
*et al.*,

                    Plaintiffs,

        -against-                                    1:18-CV-0546 (LEK/CFH)

FABTECH-NY LLC, *et al.*,

                    Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Plaintiffs Charles Ramsey Company, Inc. ("Charles Ramsey" or, simply, "Ramsey") and

Richard Trout (together, "Plaintiffs") have sued defendants Fabtech-NY LLC ("Fabtech"),

Vincent J. Hart, Jeremiah K. Hart (together, the "Harts"), John and Jane Does 1-10, and John

Doe Corporation. Dkt. No. 36 ("Amended Complaint"). In essence, this case concerns

allegations by Charles Ramsey and owner Trout that the Harts, longstanding Ramsey employees,

conspired with Fabtech to embezzle money from Ramsey, steal its trade secrets, and destroy its

business. See Am. Compl.

        Plaintiffs bring six claims under New York State tort law and allege violations of the

Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.* Id. Fabtech and the Harts have

separately moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure

("FRCP") 12(b)(6) for failure to state a claim upon which relief can be granted and, against

Trout, under FRCP 12(b)(1) for lack of standing. Dkt. Nos. 26 ("Fabtech MTD"); 31 ("Hart

MTD"); 33 ("Fabtech Letter" clarifying the status of their MTD arguments). Plaintiffs oppose

these motions. Dkt. Nos. 39 ("Opposition to Hart MTD"); 40 ("Opposition to Fabtech MTD"). In

turn, Fabtech and the Harts have filed replies. Dkt. Nos. 41 ("Fabtech Reply"); 42 ("Hart Reply").

For the following reasons the Court grants in part and denies in part the motions to dismiss.

## II. BACKGROUND

### A. Factual Background

At this stage, "[t]he Court draws all facts, which are assumed to be true, from the Complaint." Maddison v. Comfort Sys. USA (Syracuse), Inc., No. 17-CV-359, 2019 WL 4805328, at *1 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (citing Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 210 (2d Cir. 2012)). Additionally, "[f]or purposes of a motion to dismiss, . . . a complaint . . . include[s] any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Sprole v. Underwood, No. 18-CV-1185, 2019 WL 4736241, at *3 (N.D.N.Y. Sept. 27, 2019) (Kahn, J.) (citing Rothman v. Gregor, 220 F.3d 81, 88–89 (2d Cir. 2000)).

*1. The Business and the Purchase*

Charles Ramsey was founded in the Bronx, New York, in 1895. Am. Compl. ¶ 19. The company manufactured specialized hardware and components for pianos, which, until 2017, it supplied to piano manufacturers such as Steinway and Schaff. Id. ¶¶ 17, 68, 158. Much later, in the 2010s, Ramsey diversified its business by beginning to polish "hose and cable reels" for a company called Hannay Reels, which supplied "the firefighting and oil and gas industries." Id. ¶¶ 64–65. At the time of suit, Charles Ramsey was incorporated in Delaware and had its manufacturing facility in Kingston, NY. Id. ¶¶ 20, 158.

In 1993, Trout bought Charles Ramsey with two fellow investors. Id. ¶ 22. Trout is an entrepreneur who lives in Pennsylvania and has run Charles Ramsey from his offices Swedesboro, New Jersey. Id. ¶¶ 1, 2, 33. In 1995, Trout bought out his co-investors and became the sole owner of Charles Ramsey. Id. ¶ 31.

When Trout and his co-owners bought Charles Ramsey in 1993, the company's manager was a man named Vincent Hart. Id. ¶ 26. Vincent's son, Jeremiah, also worked for Charles Ramsey, as a "manufacturing employee." Id. ¶ 27.[1] Vincent "made it clear to the three new co-owners that he served essential management functions and would be the key point of contact for the absentee owners, none of whom lived in or near Kingston, New York." Id. ¶ 26.

### 2. The Assets

When Trout bought Charles Ramsey in 1993, one of his co-investors "prepared an asset book . . . in which each asset of Charles Ramsey was individually listed." Id. ¶ 29. The asset book showed that "the lathes, drills, presses and other machinery acquired in the purchase of Charles Ramsey were aging and had little value, but the tooling and patterns owned by Charles Ramsey were extremely valuable to the company." Id. ¶ 30. Trout "confirmed" this himself later on "through his review of the Asset Book and the facility and machinery owned by Charles Ramsey." Id.

Steinway and Schaff would later claim ownership of the valuable tooling and patterns. Steinway's claim stemmed from a 2001 fax purportedly sent to Steinway by Vincent "setting forth 'a list of pattern and tooling owned by Steinway currently being used by Charles Ramsey Co. with Steinways [sic] permission." Id. ¶ 49; Am. Compl., Ex. 1. But, in fact, the equipment listed in Vincent's 2001 letter was owned by Charles Ramsey and listed in the Asset Book. Am.

_____

[1] For the sake of clarity, the Court will refer to Vincent and Jeremiah Hart by their first names.

Compl. ¶¶ 50–53. Additionally, Vincent "lacked the authority to determine or confirm ownership of the tooling at Charles Ramsey." Id. ¶ 54. The source of Schaff's claim to various elements of Charles Ramsey tooling was a June 20, 2011 letter from Schaff's president to Trout, purporting to memorialize an agreement under which Schaff would provide Charles Ramsey certain "tools and dies" in exchange for Charles Ramsey using that equipment to produce parts for Schaff. Id., Ex. 9. This letter stated that Schaff would retain ownership of the tools and dies in question and appears to be signed by Trout on behalf of Charles Ramsey. Id.

Besides the physical assets listed in the asset book, Charles Ramsey came to have another valuable asset:

> Between 1993 and 2017, Trout spearheaded the development of a variety of novel processes and methods of application and employment of existing, altered and new tooling . . . in the service of Ramsey's customers. These [m]ethods include, but are not limited to, certain jig creation and replication developed by Trout and applied at the Charles Ramsey manufacturing facility . . . which achieved cost savings, efficiency and quality improvements in the disc polishing process for Hannay. Another example of the [m]ethods developed by Trout and utilized at the Charles Ramsey manufacturing facility . . . under his ownership was the development of a jig to create a leg plate which represented eighteen percent of the sales that Charles Ramsey made to Steinway.

Id. ¶¶ 148–50.

Because the methods "provided Charles Ramsey with the economic edge necessary to maintain its business," Trout repeatedly told Charles Ramsey's employees that the methods were "sensitive information." Id. ¶¶ 153–54. The Harts were familiar with the methods and knew that they were "sensitive." Id. ¶151.

### 3. Crisis and Recovery

During the initial period of Trout's solo ownership, Charles Ramsey prospered. "In 2000, . . . sales peaked at $1,700,000, with annual profits of almost $500,000." Id. ¶ 38. Starting in 2001, however, business went into a decline. One of Charles Ramsey's major clients began to

offshore all its manufacturing, id. ¶ 41, and the September 11, 2001 attacks "ushered in an industry-wide recession from which the music industry has not recovered to this day," id. ¶¶ 42–43. Because of that recession, "Charles Ramsey terminated its office manager/bookkeeper," and laid off nine of the fourteen employees who worked for the company when Trout became sole owner. Id. ¶¶ 32, 44, 45.

In an effort to preserve Charles Ramsey's business, between 2006 and 2009 "Trout invested $580,000 into Charles Ramsey." Id. ¶ 55. In addition, Trout sought to diversify Charles Ramsey's customer base, eventually "enter[ing] into a business relationship with" Hannay Reels. Id. at 64. Hannay, along with Steinway and Schaff, became one of Charles Ramsey's most important customers. Id. ¶ 68. Trout's efforts apparently paid off, as Charles Ramsey experienced "a slow but steady recovery" between 2010 and 2016. Id. ¶ 57.

### 4. Ramsey has a Hart-to-Hart Succession

Around 2010, "Vincent Hart transitioned into a part-time position due to his advanced age," and Jeremiah took over his father's role as "Vice President of Operations." Id. ¶ 58. This transition led to complications.

First, while "Charles Ramsey's workload only justified the employment of a single operations manager," Jeremiah "required his father's assistance in order to manage the company's day-to-day operations." Id. ¶ 60. Vincent had threatened Trout that if he "was not given a part-time position and salary, he would instruct his son Jeremiah Hart to quit," which was problematic because the Harts "intentionally failed and refused to teach any other employees to perform the tasks for which they were responsible at Charles Ramsey, thereby assuring their long-term necessity to Charles Ramsey." Id. These circumstances compelled Trout to hire Vincent part time, "even though Charles Ramsey's decline in sales between 2006 and 2009 did not support this salary or justify his employment beyond one day per week at most." Id. ¶ 61.

Second, "Jeremiah Hart inserted himself in the pricing negotiations with Steinway," which previously Trout had handled by himself, on an annual basis. Id. ¶ 59. Jeremiah would negotiate pricing with Steinway for "each contract individually," "without notifying or seeking approval from Trout." Id.

Third, Jeremiah "was chronically absent from Charles Ramsey, and at one time even operated a house-shingling business during the workday while simultaneously collecting a salary from Charles Ramsey." Id. ¶ 63, 264.

Fourth, Jeremiah "sold Charles Ramsey's excess metal as scrap" and kept the money for himself. Id. ¶ 264.

And fifth, in an effort to secure his annual performance bonus, Jeremiah "terminated the existing practice of sending regular financial statements and receipts to Trout's New Jersey office," and instead "began to knowingly and intentionally misrepresent Charles Ramsey's earnings to Trout." Id.

### 5. *The Relationship with Fabtech*

In January 2014, the Harts—on behalf of Charles Ramsey—began contracting with a new supplier, a company named Fabtech LLC, based in Elizaville, NY. Fabtech would supposedly ship machined goods to Charles Ramsey that Ramsey could not produce itself, and Ramsey would, in turn, remit payments to Fabtech. Am. Compl., Ex. 4.

In 2014, Trout asked his daughter, Jessica Trout, to serve as bookkeeper for Charles Ramsey. Id. ¶ 77. In October 2016, Jessica Trout "became suspicious of Charles Ramsey's purchases from Fabtech." Id. ¶ 80. She described her concerns in an email:

> Just as I was entering this role [as bookkeeper for Charles Ramsey], [Ramsey] started purchasing a lot of materials from a company called Fab Tech [sic].
>
> . . .

We never get packing slips for their deliveries. I have been paying the bills as they are submitted to me.

But for most other companies, there are packing slips that match up with the bills, so I can check for accuracy before paying. Almost all of the bills are on point across vendors.

These bills are not sent to us in the mail, but rather are forwarded to me each time in the box from [Jeremiah] . . . I am wondering why there are never any packing slips or paperwork for all these bills that we receive?

Id. ¶ 81.

Jessica Trout then wrote an email to Jeremiah, asking him to clarify why Charles Ramsey never received "purchase orders or packing slips" from Fabtech and whether he was "screening these [orders/bills] for accuracy." Id. ¶ 82. In response, Jeremiah wrote the following email:

I verbally tell [Fabtech] and monitor every item for sure[.] No problem making hard copies going forward. [Fabtech] hand delivers all hardware with zero shipping costs which is a huge savings in itself[,] not to mention costs are significantly lower than all current supplier[s] and [they] do work we are unable to do due to high tech CNC and 5 axes machining of new hardware . . . . [W]as glad to find these guys. Blessing. Let me know if you need hard copy or if its ok for me to monitor (I can sign off on each one stating we received and date it[,] would that work[?])

Am. Compl., Ex. 4. This apparently allayed any suspicions at that time.[2]

### 6. The Beginning of the End of Charles Ramsey

Crisis approached Charles Ramsey again late in 2016. During the second half of 2016, Jeremiah did not inform Trout "in real-time" of Charles Ramsey's declining sales numbers. Id. ¶ 75. This was because "Jeremiah Hart's end-of-year bonus depended upon Trout's perception of

---

[2]  The Amended Complaint does not say what Jessica Trout's response was to this email, whether she raised her concerns to her father at that time, or whether her suspicions were allayed by Jeremiah's email. In light of the silence and that Charles Ramsey continued to pay Fabtech's invoices through June 2017, see Am. Compl., Ex. 2, the Court infers that Plaintiffs let the matter rest there.

the profitability of Charles Ramsey that year." Id. Trout only discovered the declining numbers

because of the work of his daughter Jessica. Id. ¶ 78.

Additionally, orders from Steinway continued to shrink. In November 2016, because of

its declining sales, Steinway asked Charles Ramsey to drop its prices by 4%. Am. Compl. ¶ 73.

Then, in January 2017, Steinway representatives told Trout that they expected orders to be "20%

below customary levels for the next two years." Id. ¶ 83. Hannay, too, was placing fewer orders

because of a slowdown in the oil and gas industry. Id. ¶ 85. At that time, "based upon the

recommendation of Jeremiah Hart," Charles Ramsey fired one employee and reduced the

remaining employees' hours. Id. ¶ 84.

It turned out, however, that Steinway's predictions had been overly optimistic. Instead of

a mere 20% reduction from the previous year's numbers, during the first quarter of 2017,

Steinway's orders "were only 63% of the orders placed during the same time period in 2016." Id.

¶ 88. Trout continued to lay people off and reduce the hours of Charles Ramsey's workforce,

mostly following Jeremiah's recommendations and statements about the number of work orders

that were coming in. Id. ¶¶ 90–91, 97–98; Am. Compl., Ex. 5. This culminated in Vincent's

resignation from Charles Ramsey on June 9, 2017. Am. Compl. ¶ 95.

### 7. *The End of Charles Ramsey's Relationship with Hannay*

Things came to a head in the summer of 2017. As business continued to dwindle, Trout

paid a visit to Charles Ramsey and "discovered an abnormally high level of Hannay product on

site waiting to be polished." Id. ¶ 99. Also during that visit, Trout "received a call . . . from

Hannay inquiring after a[] [large] order . . . which was overdue." Id. ¶ 99–100. When he

investigated, Trout learned that production on Hannay's order had not even begun. Id. ¶ 101.

Trout spoke to Jeremiah about the Hannay order—"which Jeremiah Hart had completely

ignored"—but Jeremiah insisted there were "no issues with Hannay." Id. ¶ 102. In an attempt to

meet Hannay's needs, Trout "scrambled to increase Charles Ramsey's production and staffing," but to no avail. Id. ¶ 101.

On July 28, 2017, and apparently in response to the delayed order, Hannay sent Trout a letter explaining its concerns about continuing to do business with Charles Ramsey. Am. Compl., Ex. 7. The letter stated, in part:

> Hannay Reels has been concerned for several weeks now about Charles Ramsey's late deliveries (and even somewhat with quality issues we hadn't had in the past). When one of my shop foremen expressed concern back then to Ramsey, we did learn that there was some reduction in staff and hours. That said, we were still under the impression that we would soon be caught up.

> Now, after speaking with [Jeremiah] Hart about order status a couple of days ago, he told me he has resigned. With this news, I began to ask a lot more questions and piece things together, and I have to say that I am deeply concerned about the rapidly changing situation at Ramsey.

> When we moved all of our polishing business [to Charles Ramsey] several years ago, I made it very clear to Charles Ramsey that Hannay Reels insisted on:
>    1. Stability in personnel
>    2. Consistency in deliveries and quality
>    3. A polisher where Hannay didn't represent more than a third of the sales volume . . .

> It would appear that all 3 criteria listed above are no longer true. The personnel who knew our parts best are now gone. The deliveries are to the point where we have missed promised delivery dates to some very important customers. It's now becoming apparent that Hannay's volume at Ramsey may shortly represent a majority of Ramsey's business. Add it all up, and it's not something I can live with.

> In recent days, I found an alternative polishing source across the Hudson River, and as a defensive measure, I am making arrangements to have them pick up our next couple of loads to see how they perform . . . .

Id.

In response, Trout sent an email to President of Hannay, stating in part:

> Needless to say, this all comes as a surprise to me. As you know from our meeting a few months ago, I have been pretty much a hands off owner as long as things were going smoothly. However, as the piano sales segment of our business slowed, I took it upon myself to get more involved. This uncovered

some serious miscommunications. But, of more import, it forced some painful decisions to be made.

I was totally unaware of either any quality issues or of poor deliveries. In fact, I followed [Jeremiah Hart's] recommendations in releasing one of our employees who was dedicated to Hannay work.

So, please call me Monday so we can explore both how things got to this stage, and how we can make it right.

Am. Compl., Ex. 8.

In their follow-up phone conversation, the President of Hannay told Trout that his alternative polishing source located "across the Hudson River"—and named in the Amended Complaint as John Doe Corp.—"already employed two former Charles Ramsey employees." Am. Compl. ¶ 117.

Though the Amended Complaint does not say, presumably Charles Ramsey's relationship with Hannay came to an end shortly after that. It also appears that Jeremiah was on vacation when Hannay ended its relationship with Charles Ramsey. Id. ¶ 103.

### 8. *Discovery of the Harts' Plot*

Despite having told Hannay that he had resigned, Id. ¶ 106; Am. Compl., Ex. 7, Jeremiah had not told Trout about any purported resignation from Charles Ramsey, Am. Compl. ¶ 103. This discrepancy and other aspects of the call with Hannay apparently raised Trout's suspicions. For one, "Hannay [had] indicated that it was placing polishing orders that were not performed or [were] poorly executed, but the bookkeeper's investigation indicated a reduction in orders, and both Jeremiah Hart and Vincent Hart previously directed that employee layoffs were justified by decreased customer orders." Id. ¶ 104. For another, Jeremiah had apparently "represented to Hannay that Charles Ramsey was experiencing significant 'business problems,' resulting in layoffs and reduced work schedules." Id. ¶ 105.

At this time, "Trout discovered that all of Charles Ramsey's essential files—including the formation documents and the Asset Book—were missing," id. ¶ 47, and the Harts had taken the asset book, id. ¶ 46.

Also at this time, Trout's daughter Jessica shared with him her earlier concerns about Charles Ramsey's relationship with Fabtech. Id. ¶ 119. Trout decided to investigate further and discovered that Fabtech's manufacturing facility "consisted of a few small aluminum sided garage-like structures on a dirt road where no substantial manufacturing could be accomplished." Id. ¶ 122. He also discovered that the Harts had "engaged in a scheme" with Fabtech in which they defrauded Charles Ramsey of $244,000 from 2014 to 2017. Id. ¶¶ 71–72, 120; see also id., Ex. 2 (chart listing dates and dollar amounts of all allegedly fraudulent Fabtech invoices paid by Charles Ramsey). Fabtech was billing Charles Ramsey for goods that Charles Ramsey itself made and Fabtech did not. Id. ¶¶ 120, 124. And during these same years in which the Harts "caused Charles Ramsey to make and pay for the purported procurements from Fabtech," Jeremiah had been telling Trout "that employee layoffs were necessary because Charles Ramsey's business was slow. Id. ¶ 126. But "[i]t made no sense for Charles Ramsey to procure items from Fabtech which Charles Ramsey was capable of manufacturing itself, particularly when business was purportedly slow and employees had insufficient work to justify full-time employment." Id. ¶ 127. Based on these facts, Trout concluded that "Fabtech is a sham company owned and/or managed by one or more associates of Defendant Vincent Hart and/or Defendant Jeremiah Hart, which includes or may include one or more of John and Jane Does 1-10." Id. ¶ 123.

When Jeremiah returned from vacation at the end of July 2017, he told Trout that he was resigning "in order to move to North Carolina where his daughters reside." Id. ¶ 110. However,

before he finished at Charles Ramsey, and "without instruction or permission," Jeremiah "identified each pattern and tool used to manufacture parts and hardware for Steinway and Schaff, removed those identified patterns and tools from Charles Ramsey's manufacturing floor, and placed those identified patterns and tools on pallets." Id. ¶ 111. He then prepared these pallets for shipping.[3] Id. ¶ 112. When Trout asked Jeremiah why he was doing this, Jeremiah replied that "he was merely organizing and identifying the tooling and patterns." Id. ¶ 113.

### 9. The Deterioration of Ramsey's Relationship with Steinway and Schaff

Around the same time as Trout realized Hannay was having problems, Steinway and Schaff "[s]uddenly and without warning or precursor" both asserted that they owned Charles Ramsey's valuable tooling and requested that Charles Ramsey send the tooling back to them. Id. ¶¶ 107–08. There began a protracted series of communications, extending into the autumn of 2017, in which both piano companies repeatedly insisted that they owned the tooling and that Charles Ramsey return it to them. Id. ¶¶ 109, 129–40. Steinway based its claim on the "undated and unsigned letter of Vincent Hart purportedly transmitted to [Steinway's representative] on November 29, 2001." Id. ¶ 140; Am. Compl., Ex. 1. In turn, Schaff stated that "'Jerry [Jeremiah Hart] will vouch for us' with respect to Schaff's purported ownership of the tooling." Id. ¶ 133. Schaff also stated that it was their "understanding that everything is on a skid ready to return to us," indicating that they somehow knew that Jeremiah had prepared all the tooling for shipment. Id. ¶ 134.

The Amended Complaint does not state how or whether Charles Ramsey's dispute with Steinway and Schaff over the tooling's ownership was resolved. See Am. Compl.

---

[3] Though, apparently, he never shipped them. Am Compl. ¶ 14.

## 10. *The Closure and the Aftermath*

In August 2017, shortly after Charles Ramsey's business relationships with Hannay, Steinway, and Schaff began to nosedive, Charles Ramsey shut down. Id. ¶ 158. After the shutdown, Fabtech contacted Charles Ramsey's former landlord and attempted to rent Charles Ramsey's manufacturing facility and buy Charles Ramsey's old equipment. Id. ¶¶ 143–44. Encouraged by Jeremiah Hart or Fabtech, Steinway and Schaff likewise contacted the landlord in an attempt to retrieve the tooling. Id. ¶¶ 144, 146.

As of July 2018, when the Amended Complaint was filed, Jeremiah and at least two other former Charles Ramsey employees were working for Fabtech. Id. ¶¶ 145, 147.

Trout is currently winding up Charles Ramsey's business from his New Jersey headquarters. Id. ¶ 158.

Based on the information obtained during Charles Ramsey's collapse, the Harts sought to sabotage Charles Ramsey by, among other things:

> (a) [d]estroying Charles Ramsey's longstanding business relationships with Hannay, Steinway and Schaff;
> (b) [p]rocuring employment for themselves and other Charles Ramsey employees at Fabtech and/or John Doe Corporation;
> (c) [m]isappropriating the patterns and tooling used by Charles Ramsey to make piano parts and hardware for Defendant Steinway and Defendant Schaff;
> (d) [a]ssisting Fabtech and/or John Doe Corporation in luring Charles Ramsey employees away from Charles Ramsey;
> (e) [a]ttempting to procure Charles Ramsey's facility, machinery and tooling by and through [Ramsey's former landlord]; and
> (f) [e]mbezzling nearly $250,000 from Charles Ramsey by submitting false invoices of Defendant Fabtech for items manufactured by Charles Ramsey."

Id. ¶ 156.

### B. Procedural History

On May 7, 2018, Plaintiffs filed a complaint in this Court. Dkt. No. 1 ("Complaint"). In response, on June 18, 2018, the Harts filed an initial motion to dismiss. Dkt. No. 14 ("Initial

MTD"). On July 3, 2018, Plaintiffs opposed the motion and filed a motion to amend their Complaint. Dkt. Nos. 16 ("Motion to Amend" and "Opposition"); 16-2 ("Trout Declaration"); 16-3 ("Proposed Amended Complaint"). The Harts then filed an initial reply on July 9, 2018. Dkt. No. 19 ("Initial Reply").

However, at the time of filing their Motion to Amend, Plaintiffs were still within the time period in which they could file an amended complaint as of right and therefore did not need to seek the Court's leave. Dkt. No. 22 ("November 2018 Text Order"). The Court determined that the Amended Complaint had automatically superseded the original Complaint, id., but still needed to resolve the motion, which typically would have been mooted by the filing of an amended complaint, see id. (citing Byng v. Campbell, 07-CV-471, 2009 WL 152708, at *1 (N.D.N.Y. Jan. 21, 2009)). But because Plaintiffs' Motion to Amend and Opposition and the Harts' Initial Reply addressed the contents of the Amended Complaint, the parties agreed—with the Court's permission—that the Court could decide the motion to dismiss without further briefing. Dkt. No. 23.

Then, on November 30, 2018, Fabtech filed its own motion to dismiss. Fabtech MTD. Based on Fabtech's MTD, the Harts decided to amend their Initial MTD. After receiving permission from the Court, Dkt. No. 28, on December 28, 2018, the Harts filed their amended MTD. Hart MTD. Plaintiffs opposed these motions to dismiss, Opp'n to Hart MTD; Opp'n to Fabtech MTD, and, in turn, Fabtech and the Harts filed replies, Fabtech Reply; Hart Reply.

Lastly, when the Court confirmed that Plaintiffs' Amended Complaint was the operative pleading in the November 2018 Text Order, for clarity it also directed Plaintiffs to file the Proposed Amended Complaint separately so that the new pleading would have its own Docket Number. Nov. 2018 Text Order. Plaintiffs forgot to do so until January 23, 2019, at which time

they filed the Amended Complaint docket number 36. The Court wishes merely to clarify that, despite the late appearance of the Amended Complaint on the docket, the Amended Complaint at Docket Number 36 is identical to the document the parties have treated as the operative pleading throughout the course of briefing the instant motion—the Proposed Amended Complaint at Docket Number 16-3—and therefore these two docket entries can be treated interchangeably.

### C.  Claims and Defenses

Charles Ramsey and Trout together bring two claims: (1) Fabtech and the Harts violated the DTSA; and (2) Fabtech and the Harts committed fraud. See Am. Compl. ¶¶ 159–82, 250–65. And, Charles Ramsey alone brings an additional five claims: (3) the Harts breached their common law duty of loyalty to their employer; (4) Fabtech and the Harts engaged in unfair competition with Charles Ramsey; (5) Fabtech and the Harts tortiously interfered with Charles Ramsey's prospective economic advantage; (6) the Harts violated the common law doctrine of "money had and received"; and (7) Fabtech and the Harts together conspired to misappropriate Charles Ramsey's trade secrets. See Am. Compl. ¶¶ 183–249.

Fabtech and the Harts have separately moved to dismiss the Amended Complaint in its entirety for failure to state a claim under FRCP 12(b)(6). Hart MTD; Fabtech MTD. Alternatively, they have also moved to dismiss Trout's claims on the basis that he lacks standing to sue under the DTSA and under New York law.[4] Hart MTD; Fabtech MTD.

---

[4]  While Fabtech makes its standing argument under FRCP 12(b)(1), Fabtech MTD at 1, the Harts purport to raise their standing argument under FRCP 12(b)(6), Hart MTD at 1. Challenges to a litigant's standing are more properly raised on a 12(b)(1) motion for lack of subject-matter jurisdiction. See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88–89 & n.6 (2d Cir. 2006) ("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6) . . . the proper procedural route is a motion under Rule 12(b)(1)."). Therefore, the Court will consider each defendant's standing arguments under FRCP 12(b)(1).

## III.   LEGAL STANDARDS

### A.  12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "To survive a defendant's Rule 12(b)(1) motion to dismiss for lack of standing, plaintiffs must allege facts that affirmatively and plausibly suggest that [they have] standing to sue." Kiryas Joel Alliance v. Village of Kiryas Joel, 495 F. App'x 183, 188 (2d Cir. 2012) (alteration in original) (internal quotation marks omitted). In considering a motion to dismiss under Rule 12(b)(1), a court must accept as true all material factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiffs. Buday v. N.Y. Yankees P'ship, 486 F. App'x 894, 896 (2d Cir. 2012). Plaintiffs bear the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence. See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading, Inc., 697 F.3d 59, 65 (2d Cir. 2012).

### B.  12(b)(6)

To survive a motion to dismiss under FRCP 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (citing Twombly, 550 U.S. at 556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Put another way, a claim is plausible if it is supported by "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Twombly, 550 U.S. at 556. In assessing whether this standard has been met, courts "must accept all allegations in the complaint as true and draw all

inferences in the light most favorable to the non-moving party[] . . . ." <u>In re NYSE Specialists</u> <u>Sec. Litig.</u>, 503 F.3d 89, 95 (2d Cir. 2007) (internal citation omitted).

## IV.   DISCUSSION

The Court begins with the jurisdictional issue decided under FCRP 12(b)(1): standing. The Court then addresses, in turn, whether each of the seven counts in the Amended Complaint survives a 12(b)(6) motion.

### A.  Standing

Article III of the Constitution confines the judicial power of federal courts to deciding "Cases" or "Controversies." U.S. Const. art. III, § 2. "One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so." <u>Hollingsworth v. Perry</u>, 570 U.S. 693, 704 (2013). To have standing to invoke the power of a federal court, a litigant must prove that: (1) she "has suffered a concrete and particularized injury"; (2) the injury "is fairly traceable to the challenged conduct"; and (3) the injury "is likely to be redressed by a favorable judicial decision." <u>Id.</u> (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–61); <u>see also</u> <u>Lujan</u>, 504 U.S. at 560 (describing these three elements as "the irreducible constitutional minimum of standing"). In the corporate context, "[a] shareholder– even a sole shareholder–does not have standing to assert claims alleging wrongs to the corporation." <u>Jones v. Niagara Frontier Transp. Auth. (NFTA)</u>, 836 F.2d 731, 736 (2d Cir. 1987). "Rather, the plaintiff must have been injured in a 'personal and individual way' in order to have standing." <u>Liberty Sackets Harbor, LLC v. Vill. of Sackets Harbor</u>, No. 18-CV-242, 2018 WL 4609129, at *9 (N.D.N.Y. Sept. 25, 2018) (quoting <u>Lujan</u>, 504 U.S. at 560 n.1), <u>aff'd</u>, 776 F. App'x 1 (2d Cir. 2019).

Trout participates as plaintiff in his own right in the Amended Complaint's DTSA and fraud claims. <u>See generally</u> Am. Compl. Defendants argue that Trout does not have standing to

bring either of these claims against them, because "[t]he [Amended] Complaint alleges no injuries [to Trout] separate from those alleged to Ramsey . . . ." Hart MTD at 23. This means, according to Defendants, that Trout could only bring the claim through his ownership of Charles Ramsey, and "[a]n individual shareholder does not have standing to litigate a corporation's rights." Id. (citing Domino's Pizza, Inc. v McDonald, 546 U.S. 470, 478 (2006); Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir. 1986)). Therefore, "Trout has no standing and no justiciable claims." Hart MTD at 23. The Court agrees with respect to the fraud claim but disagrees with respect to the DTSA claim.

### 1. Fraud

"It is 'well-settled that shareholders lack standing to assert individual claims based on injury to the corporation.'" Mecca v. Lennon, No. 16-CV-1414, 2017 WL 1410790, at *4–5 (E.D.N.Y. Apr. 18, 2017) (quoting Baltus-Michaelson v. Credit Suisse First Boston, LLC, 116 F. App'x 308, 309 (2d Cir. 2004)). Here, the Amended Complaint contains no allegations of injury to Trout separate and distinct from injuries to Charles Ramsey. Trout's fraud claim is based on the allegation that the Harts and Fabtech knowingly and intentionally engaged in a scheme to submit false invoices to Charles Ramsey, billing Ramsey for goods that Fabtech did not supply, and that Ramsey itself produced, to the tune of over $240,000. Am Compl. ¶¶ 120–28, 250–65. The fraud claim also rests upon allegations that Jeremiah made unauthorized sales of Charles Ramsey's scrap metal, failed to properly log to take sick and vacation days, and ceased sending Trout financial statements. Am. Compl. ¶ 266. While these alleged fraudulent acts could have caused Charles Ramsey to pay out money to Fabtech and to the Harts, there are no allegations in the Amended Complaint that they caused Trout himself to pay out any money. See generally Am. Compl.

Where a complaint pleads only an injury to the corporation and fails to plead a separate injury to the shareholder plaintiff, the plaintiff has no standing. Albany Plattsburgh United Corp. v. Bell, 763 N.Y.S.2d 119, 122 (2003) ("It is axiomatic that a shareholder has no individual cause of action to recover damages for a wrong against a corporation."); New York State Workers' Comp. Bd. v. Comp. Risk Managers, LLC, 67 N.Y.S.3d 792, 800 (N.Y. Sup. Ct. 2017) ("[I]t is black letter law that a shareholder has no individual cause of action for a wrong committed against the corporation.").[5] Under the circumstances, Trout has not plausibly pled a personal injury and does not have standing to sue in his own right. See Barry v. Curtin, 993 F. Supp. 2d 347, 352 (E.D.N.Y. 2014) ("The crux of this action is that Defendants allegedly looted the Corporate Plaintiffs for their own personal gain. Allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the corporation only, for which a shareholder may . . . not [sue] individually.") (internal quotation marks and alterations omitted); Strougo v. Bassini, 282 F.3d 162, 167 n.4 (2d Cir. 2002) ("[D]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right." (quoting Rand, 794 F.2d at 849 (citation and internal quotation marks omitted)); Albany Plattsburgh, 763 N.Y.S.2d at 122 (allegations that a defendant "misappropriated, converted and diverted [his company's] assets by entering into various agreements with other individuals and entities in breach of his fiduciary duties" "were essentially corporate in nature" and did not support standing of an individual company shareholder).

---

[5] Without objection from Defendants, Plaintiffs urge the Court to apply New York law to this dispute, including to the resolution of the instant shareholder standing question. Opp'n to Hart MTD at 11 n.6. In the absence of objection and more thorough briefing from the parties, the Court applies New York law. See, e.g., Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 (2d Cir. 2001) ("The parties' briefs assume that New York substantive law governs . . . and such implied consent is, of course, sufficient to establish the applicable choice of law.").

Trout's protests to the contrary are unavailing. Trout argues that, under New York law, "an individual shareholder lacks standing to bring his or her claim only where the duty owed to the shareholder is . . . indistinguishable from the duty owed to the corporation." Opp'n to Hart MTD at 12 (citing Henneberry v. Sumitomo Corp. of Am., 415 F. Supp. 2d 423, 439–40 (S.D.N.Y. 2006)). Therefore, according to Trout, "where the individual plaintiff alleges that the defendants owe him a duty separate from the duty owed to the corporation, [a] claim is not subject to dismissal for lack of standing." Id. at 11. While the Court agrees with Trout's recitation of the law, Trout has failed to satisfy the law's tenets; nowhere does the Amended Complaint allege that the Harts or Fabtech owe Trout *personally* a duty separate from any duty owed to Charles Ramsey. See generally Am. Compl. Nor does the Amended Complaint—or Plaintiffs' opposition briefing—explain why these Defendants would owe Trout a fiduciary duty. Trout, as plaintiff, bears the burden to establish standing, and he has failed to do so. See Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.a.r.l, 790 F.3d 411, 417 (2d Cir. 2015) ("The plaintiff bears the burden of alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue." (internal quotation marks omitted)).

Additionally, Trout attempts to argue that he suffered a particularized injury distinct from the injury suffered by Charles Ramsey, stating that "[t]he fraud alleged . . . by Trout . . . seeks to redress a direct harm suffered by Trout—the siphoning by [the Harts] and Fabtech of the $244,000 Trout infused into Ramsey," while Ramsey's alleged injury "is the decline in its value, loss of profits and ultimate shuttering of its enterprise due to [the Harts'] fraud." Opp'n to Hart MTD at 11 (citing Am. Compl. ¶¶ 247–59). Yet the Court is unpersuaded by this argument, as any money Trout invested into Charles Ramsey became the property of Charles Ramsey (not Trout), and thus the "siphoning" off of that money would injure Charles Ramsey, not Trout. See

<u>Niagara Frontier</u>, 836 F.2d at 736 ("Even though [plaintiff] may have felt personally aggrieved by defendants' [actions toward] the Corporation, and even though he may have faced the risk of financial loss as a result, the district court correctly dismissed Jones' individual claims for lack of standing.").

For the above reasons, Trout has failed to establish that he has standing to assert a claim of fraud, and the Court grants Defendants' 12(b)(1) motion to dismiss. <u>See also</u> <u>Alphas v. City of New York Bus. Integrity Comm'n</u>, 15-CV-3424, 2017 WL 1929544, at *3 (S.D.N.Y. May 9, 2017) (finding the plaintiff lacked standing to sue where all of the alleged injuries were either [a] direct injuries to the Company, or [b] indirect injuries flowing from harm to the Company, and therefore were not distinct from the injuries to the Company).

### 2. DTSA

However, Trout has plausibly alleged standing to bring a DTSA claim. Defendants argue that the Amended Complaint does not allege that Trout owns any trade secrets, thus precluding standing to bring a DTSA claim. Hart MTD at 23. They base this argument on the Amended Complaint's statement that "Trout—Ramsey's President—'spearheaded' development of the Methods" and did so "at the Ramsey manufacturing facility." Hart MTD at 23 (citing Am. Compl. ¶ 148; Trout Decl. ¶¶ 13, 14). This means, according to Defendants, that Trout does not own the methods, does not therefore own any trade secrets, and thus "has no claim [for misappropriation of trade secrets] under the DTSA." <u>Id.</u>

However, this argument ignores the allegations in the Amended Complaint, which. at this stage, the Court assumes to be true. The Amended Complaint alleges that "Trout is the owner of the Methods," plain and simple.[6] Am. Compl. ¶¶ 166, 171–72. Because Trout retained a personal

---

[6] Defendants argue for ownership in Charles Ramsey because Trout developed the methods for Charles Ramsey's benefit at the Charles Ramsey facility. Hart MTD at 23.

and independent property interest in the methods, an alleged misappropriation of the methods would injure Trout separately from any injury that accrued to Charles Ramsey. For this reason, the Court finds that Trout has plausibly alleged standing to bring the DTSA claim.[7]

**B. Misappropriation of Trade Secrets Under the DTSA**

The DTSA provides a private cause of action to the "owner of a trade secret that is misappropriated." 18 U.S.C. § 1836(b)(1). "A plaintiff asserting claims under the DTSA must [therefore] show[:] (1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret[;] and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." Danping Li v. Gelormino, No. 18-CV-442, 2019 WL 1957539, at *8 (D. Conn. May 2, 2019) (citing Par Pharm., Inc. v. QuVa Pharma, Inc., No. 18-CV-2177, 2019 WL 1758468, at *3 (3d Cir. Apr. 3, 2019)).

The Court finds that Plaintiffs have failed to state a claim under the DTSA because they have not plausibly alleged that they owned any trade secrets. Because the Court dismisses Plaintiffs' DTSA claim on this ground, it need not consider whether Plaintiffs have plausibly alleged that the Harts or Fabtech misappropriated any trade secrets.

*1. Whether Plaintiffs Own Trade Secrets*

"The DTSA defines a trade secret as 'all forms and types of financial, business, scientific, economic, or engineering information . . . (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) . . . derives independent economic value . . . from not

---

However, given the facts in the Amended Complaint, Defendants' argument suggests, at most, joint ownership of the methods by Trout and Charles Ramsey.

[7] As will be seen below, the Court finds that Plaintiffs' DTSA claim fails on other grounds.

being generally known . . . [or] reasonably ascertainable . . . [to] another person who can obtain economic value from the disclosure or use of the information.'" <u>Lawrence v. NYC Med. Practice, P.C.</u>, No. 18-CV-8649, 2019 WL 4194576, at *4 (S.D.N.Y. Sept. 3, 2019) (quoting 18 U.S.C. § 1839(3)(A)–(B)).

In the Amended Complaint, Plaintiffs allege that "[t]he . . . tooling . . . and the Methods . . . constitute trade secrets under [the DTSA]." Am. Compl. ¶ 165. The Court considers the tooling and the methods separately and finds that Plaintiffs have failed to plausibly plead trade secret ownership in the tooling or the methods.

### 1. The Tooling

The Harts urge the Court to dismiss the portion of Plaintiff's DTSA claim based on an alleged misappropriation of the tooling because "Plaintiffs [have] disavow[ed] trade secret ownership in the Tooling." Hart MTD at 11. They base this argument on Plaintiffs' statement in the Trout Declaration—a document extrinsic to the Amended Complaint—that "[t]he Trade Secrets are not, and have never been, the tooling itself used in production for Steinway or Schaff as customers." <u>Id.</u> at 11–12 (citing Trout Decl. ¶ 15). Plaintiffs, in turn, urge the Court to reject this argument because the Trout Declaration "cannot be considered on the instant Motion" and, in any event, the tooling is still protected under the DTSA. Opp'n to Hart MTD at 14. The Court agrees with the Harts.

First, the Court finds that it can consider the Trout Declaration at this stage. Ordinarily, on a motion to dismiss, the Court can only consider documents beyond the complaint if they are "attached to the complaint, . . . incorporated by reference in the complaint . . . [or] . . . integral to the complaint." <u>Mitchell v. Cuomo</u>, No. 17-CV-892, 2019 WL 2479611, at *3 (N.D.N.Y. Jan. 3, 2019), <u>report and recommendation adopted</u>, No. 17-CV-892, 2019 WL 1397195 (N.D.N.Y. Mar.

28, 2019).[8] "To be integral to a complaint, the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'" <u>DeLuca v. AccessIT Grp., Inc.</u>, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quoting <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002)); <u>see also</u> <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir. 2010) ("[W]here the complaint relies heavily upon [a document's] terms and effect, . . . the document [is] integral to the complaint.") (internal quotations omitted).

The Harts appear to argue that the Trout Declaration is integral to the Amended Complaint, stating that "the new allegations added in the Amended Complaint rely heavily [on] Trout's Declaration testimony." Hart MTD at 11. Plaintiffs' response is contradictory. They maintain that the Court "cannot . . . consider [the Trout Declaration] on the instant Motion." Opp'n to Hart MTD at 14. But they themselves cite repeatedly to the Trout Declaration in their recitation of facts and in support of arguments against the Harts' motion. Opp'n to Hart MTD at 3, 8 (facts); <u>id.</u> at 11 (argument) (citing Trout Decl. ¶ 13). These citations to the Trout Declaration in Plaintiffs' own briefing are evidence of Plaintiffs' reliance on the facts set forth in that declaration. <u>See</u> <u>Robert H. Law, Inc. v. Woodbine Bus. Park, Inc.</u>, No. 13-CV-1393, 2018 WL 851382, at *23 (N.D.N.Y. Feb. 12, 2018) ("Plaintiff's reliance on the [extrinsic evidence] is . . . clear from [its] . . . memorandum of law . . . ."), <u>appeal dismissed</u> (Mar. 30, 2018). Additionally, since Plaintiffs drafted and submitted the Trout Declaration themselves, there is no doubt that they had notice, as required for integrality. <u>See</u> <u>Chambers</u>, 282 F.3d at 153. Especially where, as here, Plaintiffs' allegations in the Amended Complaint are undermined by their own extrinsic submissions, Courts are more likely to consider the extrinsic documents on a motion to

---

[8] There is a further exception for information that the Court can judicially notice. <u>See</u> <u>Mitchell</u>, 2019 WL 2479611, at *3.

dismiss. See, e.g., Pediford-Aziz v. City of New York, 170 F. Supp. 3d 480, 486–87 (E.D.N.Y. 2016) (on motion to dismiss, discussing how plaintiff's "own submissions," including "extrinsic documents," "clearly refute [her] claim"). Under the circumstances, the Court finds it proper to consider the Trout Declaration in resolving this motion.

Second, when considering the Trout Declaration in conjunction with the Amended Complaint, the Court finds the documents sufficiently contradictory to cast doubt on whether Plaintiffs even intend to bring a DTSA claim based on an alleged misappropriation of the tooling. "If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." Poindexter v. EMI Record Grp. Inc., No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012); see also Perry v. NYSARC, Inc., 424 F. App'x 23, 25 (2d Cir. 2011) ("[T]he court must generally accept as true all of the factual assertions in the complaint . . . . However, there is a narrow exception to this rule for factual assertions that are contradicted by the complaint itself, [or] by documents upon which the pleadings rely . . . ."). Plaintiffs state in the Amended Complaint that "[t]he . . . tooling . . . constitute[s] trade secrets under [the DTSA]." Am. Compl. ¶ 165. But the Trout Declaration contradicts the Amended Complaint, stating that "[t]he Trade Secrets are not, and have never been, the tooling itself . . . ." Trout Decl. ¶ 15; see also Am. Compl. ¶ 152 ("The Methods are distinct from and wholly separate from the tooling used in production of products sold to Ramsey customers."). The Court has trouble reconciling these statements and is left wondering just what Plaintiffs' position is vis-à-vis the tooling.

Plaintiffs' briefing for the instant motion, rather than clarifying its position, further confuses. Plaintiffs assert that the tooling is "protected" under the DTSA. Opp'n to Hart MTD at

14. But they then confirm the statement in the Trout Declaration that "[t]he trade secrets are not . . . the tooling itself" by stating that "[t]he Trade Secrets are distinct from the physical tooling owned by Ramsey," Opp'n to Hart MTD at 11, and "that Ramsey owns the Tooling [but] both Ramsey and Trout own the Methods/Trade Secrets," Opp'n to Hart MTD at 13. See also Opp'n to Hart MTD at 14 ("Moving Defendants confuse the terms of art – the Tooling (owned by Ramsey and Trout) and the Trade Secrets (also called the Methods, owned by Trout) . . . . The Complaint clearly pleads that Ramsey owns the Tooling and that Trout and Ramsey own the Methods/Trade Secrets."). Each of these statements treats the tooling as separate and distinct from the trade secrets at issue in the DTSA claim.

In the face of these contradictions, it is unclear to the Court whether Plaintiffs even intended to plead a DTSA claim based on an alleged trade secrets in the tooling. To the extent Plaintiffs did so, their contradictory pleading fails to satisfy the plausibility standard set out in Twombly and Iqbal. Camelio v. Int'l Bhd. of Teamsters, 32 F. Supp. 3d 427, 433 (W.D.N.Y. 2014) ("[C]ontradictory allegations simply cannot usher plaintiff's [claim] across the threshold of plausibility."); Accurate Grading Quality Assur., Inc. v. Thorpe, No. 12-CV-1343, 2013 WL 1234836, at *8 (S.D.N.Y. Mar. 26, 2013) ("The Court is satisfied that to extent there are contradictory allegations [in the complaint and supporting declaration], such claims should be dismissed."). Therefore, the Court dismisses without prejudice Plaintiff's DTSA claim based on alleged misappropriation of the tooling. Plaintiffs will have an opportunity to replead and clarify—both to Defendants and to the Court—exactly what they consider to be the trade secrets at issue and why they took such apparently contradictory positions regarding the tooling.[9]

---

[9] Because the Court dismisses Plaintiffs' tooling-based DTSA claim on these grounds, the Court need not consider at this time Defendants' arguments that Plaintiff did not own the

2. The Methods[10]

As described above, a trade secret is information that the owner (a) has taken reasonable measures to keep secret, and (b) from which the owner derives independent economic value by its secrecy. See Universal Processing LLC v. Weile Zhuang, No. 17-CV-10210, 2018 WL 4684115, at *2 (S.D.N.Y. Sept. 28, 2018) (citing 18 U.S.C. § 1839). Additionally, to plausibly plead a DTSA claim, a plaintiff must plead enough facts to define the "contours" of the trade secrets. See id. at *3.

Defendants do not contest that the Amended Complaint satisfies the "economic value" element. Instead, they argue that: (i) Plaintiffs have failed to sufficiently define the "contours" of the alleged trade secrets; and (ii) Plaintiffs failed to take "reasonable measures" to keep the methods secret. Hart MTD at 9–11; Fabtech MTD at 12–13. The Court considers these arguments in turn.

*i. Defining the Contours of a Trade Secret*

"[C]ourts generally consider the following factors to determine [a trade secret's] contours: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the

---

tooling and therefore cannot bring a misappropriation claim under the DTSA. See Hart MTD at 8–9; Fabtech MTD at 12–13.

[10] Unlike the tooling, Plaintiffs consistently plead that the methods are trade secrets. See Am. Compl. ¶ 165 ("[T]he Methods developed by Charles Ramsey and Trout collectively constitute trade secrets under 18 U.S.C. § 1839(3)."); Trout Decl. ¶ 12 ("[Trout] spearheaded the development of a variety of novel processes and methods . . . (hereinafter, the 'Trade Secrets') . . . .").

information could be properly acquired or duplicated by others." <u>Elsevier Inc. v. Doctor Evidence, LLC</u>, No. 17-CV-5540, 2018 WL 557906, at \*3–4 (S.D.N.Y. Jan. 23, 2018) (internal quotations omitted). Plaintiffs are "not required to plead each factor." <u>Uni-Sys., LLC v. United States Tennis Ass'n, Inc.</u>, 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018). The Harts assert that "[t]he Amended Complaint is silent with regard to most of these factors." Hart MTD at 11. Fabtech concurs: "Plaintiffs in conclusory fashion assert that the . . . Methods are trade secrets." Fabtech MTD at 12.

The Court disagrees and finds that the Amended Complaint sufficiently describes the contours of the methods. Taking the factors in order, it alleges that: (1) "the Methods were [un]known to anyone outside of Ramsey,"[11] Am. Comp. ¶ 178; (2) "Within Ramsey, only Vincent Hart and Jeremiah Hart . . . utilized the Methods," <u>id.</u>; (3) "Trout . . . reiterated [to Ramsey's employees] that the Methods constituted  sensitive information," <u>id.</u> ¶ 154; (4) one of the methods alone "represented eighteen percent of the sales that Charles Ramsey made to Steinway," <u>id.</u> ¶ 150; (5) "Between 1993 and 2017," "Trout spent great effort thereafter . . . developing the Methods, to great expense," <u>id.</u> ¶¶ 148, 179; and (6) "[t]he only way in which the . . . Methods could have been acquired by outsiders was if Trout or Vincent Hart or Jeremiah Hart shared . . . the Methods with outsiders," <u>id.</u> ¶ 180. While some of these allegations verge on the conclusory, taken together they are sufficient to meet the pleading standard. <u>See, e.g.</u>, <u>Uni-Sys.</u>, 350 F. Supp. 3d at 172 (allegations that trade secrets were developed "through great effort and expense in terms of manpower, time, and costs" and provided "commercial and business advantage to Uni-Systems by aiding Uni-Systems in offering reliable, long-lasting, and

---

[11]  As stated in the Amended Complaint: "Neither the Tooling nor the Methods were known to anyone outside of Ramsey." Am. Compl. ¶ 178.

competitively priced" products sufficient to plead a DTSA claim); Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15-CV-211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (holding that defendants adequately pled the elements of a DTSA claim where they "alleged that the information is valuable and crucial to [their] business functions and competitive position"); see also Tesla Wall Sys., LLC v. Related Companies, L.P., No. 17-CV-5966, 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) ("Trade secrets need not be disclosed in detail in a complaint alleging misappropriation." (internal citation and quotation marks omitted).

### ii. *Reasonable Measures to Keep Secret*

However, Plaintiffs have failed to adequately plead that they took reasonable measures to keep the methods secret.

"The DTSA requires that the owner of a trade secret take reasonable measures to keep its trade secret in fact secret." Xavian Ins. Co. v. Marsh & McLennan Companies, Inc., No. 18-CV-8273, 2019 WL 1620754, at *1 (S.D.N.Y. Apr. 16, 2019). "There is not a single definition for what constitutes 'reasonable measures,' though [courts have] looked to physical security measures at facilities and confidentiality agreements relating to sensitive information." United States v. Shanshan Du, 570 F. App'x 490, 500 (6th Cir. 2014); see, e.g., ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828, 2019 WL 3004161, at *4 (S.D.N.Y. July 10, 2019) (complaint adequately alleged reasonable steps because "ExpertConnect required its employees to enter into [non-disclosure agreements], . . . [t]he trade secrets could be accessed only through 'password protected entry points,' and the Employee Handbook prohibited employees from '[m]isus[ing], or remov[ing] without authorization . . . confidential information of any kind.").

The Amended Complaint states that "Trout repeatedly indicated to Charles Ramsey's employees that the Methods were critical to Charles Ramsey's ability to maintain its accounts . . ." and that "Trout also reiterated that the Methods constituted sensitive information

and provided Charles Ramsey with the economic edge necessary to maintain its business." Am. Compl. ¶¶ 153–54. That is all the information in the Amended Complaint about how Plaintiffs endeavored to keep the methods secret.

While advising employees that certain information is a trade secret can be an example of a reasonable measure, see United States v. Chung, 659 F.3d 815, 825–26 (9th Cir. 2011) ("[R]easonable measures for maintaining secrecy have been held to include advising employees of the existence of a trade secret . . . ."), the Court has found no case in which this measure alone was sufficient to state a DTSA claim. Most courts in this Circuit look to contractual confidentiality agreements or physical security measures when determining whether a party took reasonable measures to keep information secret. See, e.g., Syntel, 2016 WL 5338550, at *6 (finding that a party adequately "alleged . . . they have taken reasonable measures to keep the information secret by making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers . . ."); Medidata Sols., Inc., v. Veeva Sys. Inc., No. 17-CV-589, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018) ("The Complaint . . . pleads that Plaintiffs took reasonable steps to protect the trade secrets. Medidata required . . . employees to enter into nondisclosure agreements and prohibited its employees from making unauthorized email transfers of company documents and from retaining company documents after their employment ended. Medidata also restricted access to information to those with a need to know by using passwords and, for some applications, two-factor authentication."); Broker Genius, Inc. v. Zalta, 280 F. Supp. 3d 495, 517–18 (S.D.N.Y. 2017) (when discussing a company's efforts to maintain secrecy, noting that it "ensure[s] that its employees sign both non-disclosure agreements and employee handbooks that broadly identify the company's 'technology and products' as proprietary and/or confidential information").

The Amended Complaint contains no allegations that any measure of this kind was in use at Charles Ramsey. See generally Am. Compl. Though Plaintiffs argue that "Trout took great pains to protects the Trade Secrets," Opp'n to Hart MTD at 4, the Amended Complaint is devoid of information about what those "great pains" entailed. If "protecting information through a confidentiality agreement alone" does not constitute "reasonable measures," Universal Processing, 2018 WL 4684115, at *3; see also Lawrence, 2019 WL 4194576, at *5 (same), the Court cannot find that Plaintiffs took such measures when they have failed to allege even that much. Merely stating that they told their employees the methods "constituted sensitive information" is the kind of "[t]hreadbare recital[] of the elements of a cause of action," that Iqbal is meant to foreclose. Iqbal, 556 U.S. at 678. Therefore, the Court finds that Plaintiffs have failed to adequately plead what reasonable measures they took to keep the methods secret.[12] See Kairam v. W. Side GI, LLC, No. 19-CV-447, 2019 WL 6691512, at *3 (2d Cir. Dec. 9, 2019) (summary order) (determining that plaintiff had failed to allege ownership of trade secrets under the DTSA where she did "not allege . . . how the [alleged trade secret] derives independent economic value from not being generally known to others or what steps she took to keep the template secret."); Mintz v. Mktg. Cohorts, LLC, No. 18-CV-4159, 2019 WL 3337896, at *6 (E.D.N.Y. July 25, 2019) (determining that a DTSA claim failed and noting that plaintiff "did not require defendants to sign a non-disclosure agreement nor any sort of covenant to protect the" alleged trade secret).

---

[12] In fact, rather than limiting access, Plaintiffs apparently were dissatisfied that the Harts would not more widely share the methods with other Charles Ramsey employees. Am. Compl. ¶ 173.

Thus, the Amended Complaint fails to plausibly allege that the methods are trade secrets, and the Court dismisses without prejudice Plaintiffs' DTSA claim.[13]

### C. Breach of the Duty of Loyalty

"Under New York law, an employee owes a duty of good faith and loyalty to his employer." Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 659–61 (S.D.N.Y. 2005), aff'd sub nom. Design Strategy, Inc. v. Davis, 469 F.3d 284 (2d Cir. 2006); see also City of Binghamton v. Whalen, 32 N.Y.S.3d 727, 728 (3rd Dep't 2016) ("Firmly rooted in this state's jurisprudence is the principle that an employee is to be loyal to his [or her] employer and is prohibited from acting in any manner inconsistent with his [or her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his [or her] duties.") (alterations in original) (internal quotation marks omitted). "A breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." Poller v. BioScrip, Inc., 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013); see also Qosina Corp. v. C & N Packaging, Inc., 948 N.Y.S.2d 308, 310 (2012) ("An employee owes his or her employer undivided and unqualified loyalty and may not act in any manner contrary to the interests of the employer.") (internal quotation marks omitted). To state a claim for a breach of the duty of loyalty, "a plaintiff must show the existence of a fiduciary duty, a knowing breach of that duty, and damages resulting from the breach." Dewitt Stern Grp., Inc. v. Eisenberg, 257 F.

---

[13]   Because the Court dismisses Plaintiffs' DTSA claim on these grounds, it declines to reach Defendants' argument that Trout lacks standing to bring a DTSA claim.

Supp. 3d 542, 585 (S.D.N.Y. 2017) (citing <u>Johnson v. Nextel Commc'ns</u>, 660 F.3d 131, 138 (2d Cir. 2011)), <u>aff'd</u>, 734 F. App'x 48 (2d Cir. 2018).

The Amended Complaint alleges that the Harts breached the duty of loyalty they owed to Charles Ramsey by: (1) destroying Charles Ramsey's business relationships with Steinway, Schaff, and Hannay; (2) attempting to misappropriate the tooling; and (3) submitting false invoices from Fabtech. Am. Compl. ¶¶ 183–96. The Harts raise various arguments in response to each of these allegations. <u>See</u> Hart MTD at 13–14. Ramsey has sufficiently alleged that the Harts breached their duty of loyalty.

Because the Harts worked as Charles Ramsey's onsite managers and had access to confidential Ramsey information such as the methods, they owed Charles Ramsey a fiduciary duty of loyalty. <u>See</u> <u>Paz Sys., Inc. v. Dakota Grp. Corp.</u>, 514 F. Supp. 2d 402, 410 (E.D.N.Y. 2007) (finding that employee who "had discretion to run [plaintiff corporation's] operations," and "had access to [plaintiff's] confidential information," owed plaintiff a fiduciary duty); <u>Fairfield Fin. Mortg. Grp., Inc. v. Luca</u>, 584 F. Supp. 2d 479, 484–85 (E.D.N.Y. 2008) (observing that "all employees have a fiduciary duty to their employers, regardless of their rank and the level of their position"). The Amended Complaint sufficiently alleges that the Harts breached that duty. The Amended Complaint states, among other things, that the Harts withheld Ramsey's sales and revenue information from Trout, sabotaged Ramsey's business by causing Trout to lay off key employees, Am. Compl. ¶¶ 97–106, 126, encouraged Ramsey employees to go work at competitors such as Fabtech, <u>id.</u> ¶¶ 156, attempted to set up Fabtech as a competitor business, <u>id.</u>, and stole money from Charles Ramsey by engaging in fraudulent transactions with Fabtech, <u>id.</u> ¶¶ 119–28. These alleged actions caused the decline and failure of Charles Ramsey's business. <u>See</u> Am. Compl. Thus, the allegations plausibly state a claim for breach of the Harts'

duty of loyalty. See, e.g., Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 522 (S.D.N.Y. 2011) (finding that defendants breached duty of loyalty by, in part, taking "deliberate steps to leave [plaintiff company] understaffed just as [their competing business] was opening."); Am. Map Corp. v. Stone, 694 N.Y.S.2d 704, 705 (1999) (stating that a defendant's "use of fictitious buyers . . . to retain for his own account a share of the proceeds due his employer conclusively establish a breach of the fiduciary duty owed to his employer"); City of Binghamton, 32 N.Y.S.3d at 728–29 (defendant's admission to stealing from plaintiff employer over a six-year period constituted a "persistent pattern of disloyalty"); Qosina, 948 N.Y.S.2d at 311 ("Acting for and on behalf of a competing business in a manner that was contrary to the interests of [an employee's employer]" was "sufficient to state a claim of the breach of duty of loyalty.").

The Harts' arguments to the contrary are unavailing. For example, the Harts' assertion that Hannay terminated its business relationship with Charles Ramsey for its "own business reasons," including "instability in Ramsey's workforce," Hart MTD at 14, ignores the fact that the "instability" in Charles Ramsey's workforce stemmed from the Harts own machinations, Am. Compl. ¶¶ 97–106. Moreover, the Harts' statement that Trout should have made "the simple expedient of a phone call to FabTech" if he doubted Jeremiah Hart's explanation about FabTech's relationship with Charles Ramsey, Hart MTD at 14, may be a permissible argument at trial to mitigate damages but is hardly dispositive at the motion to dismiss stage when the sole issue before the Court is whether Plaintiffs have stated a claim. Thus, the Court finds that Charles Ramsey has successfully pled a breach of fiduciary duty claim and accordingly denies the Harts' motion to dismiss this claim. See also Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425,

455 (S.D.N.Y. 2012) ("New York courts generally avoid dismissing a claim of breach of fiduciary duty . . . because [those claims] usually involve[] . . . question[s] of fact.").

### D.  Unfair Competition

"Under New York law, an unfair competition claim encompasses a broad range of unfair practices." Carson Optical, Inc. v. Prym Consumer USA, Inc., 11 F. Supp. 3d 317, 328 (E.D.N.Y. 2014); see also Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp. 2d 609, 619 (S.D.N.Y. 2003) ("[U]nfair competition may take many forms.") (citing National Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 851 (2d Cir. 1997)). "The general principle . . . evolved from all of the cases is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one [company] of a benefit or property right belonging to another." New York Racing Ass'n v. Nassau Reg'l Off-Track Betting Corp., 909 N.Y.S.2d 866, 871 (Sup. Ct. 2010) (citing Telecom, Intl. Am. Ltd. v. AT&T Corp., 280 F.3d 175, 197 (2d Cir. 2001)) (alterations in original).

"To state a claim of unfair competition under New York law, a plaintiff must allege that the defendant 'misappropriated the plaintiffs' labors, skills, expenditures, or good will and displayed some element of bad faith in doing so.'" Optigen, LLC v. Int'l Genetics, Inc., 777 F. Supp. 2d 390, 406–07 (N.D.N.Y. 2011) (citing Abe's Rooms, Inc. v. Space Hunters, Inc., 833 N.Y.S.2d 138, 140 (2d Dep't 2007); see also Macy's Inc. v. Martha Stewart Living Omnimedia, Inc., 6 N.Y.S.3d 7, 13 (N.Y. App. Div. 2015) ("Allegations of a bad faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information can give rise to a cause of action for unfair competition.") (internal quotations omitted).

Charles Ramsey has stated a claim for unfair competition against both the Harts and Fabtech. "Valuable confidential information" about a business' sales and customers is protected by the law of unfair competition. See Advanced Magnification Instruments of Oneonta, N.Y.,

Ltd. v. Minuteman Optical Corp., 522 N.Y.S.2d 287, 289 (1987) (stating that the misappropriation of a customer list that included information such as "sales activity," a "customer's credit rating," and "other information, some of it personal, relating to the customer and the operation of the customer's office" supported a claim for unfair competition); Innoviant Pharmacy, Inc. v. Morganstern, 390 F. Supp. 2d 179, 194 (N.D.N.Y. 2005) ("The misappropriation of detailed internal customer information, as is alleged by the plaintiff in this case, can give rise to a claim of unfair competition . . . .").

      Here, Charles Ramsey alleges that Fabtech "sought to employ Defendants Vincent Hart and/or Jeremiah Hart together with at least three other former Charles Ramsey employees in order to obtain Charles Ramsey's customer information and other competitive business information." Am. Compl. ¶ 202. It further alleges that the Harts "sought to use information about Charles Ramsey's existing customers to secure employment for themselves at Fabtech and/or John Doe Corporation and/or enrich Fabtech and/or John Doe Corporation." Id. ¶ 199. The Amended Complaint then states that "Jeremiah Hart obtained employment with Fabtech," id. ¶ 145, "thus alleging that the information was taken and used," Opp'n to Hart MTD at 17. The taken information "includes but is not limited to the identity of Charles Ramsey's customers, the terms of the contractual relationship between Charles Ramsey and its customers, methods of utilization of machinery owned by Charles Ramsey, and the patterns and Tooling utilized by Charles Ramsey to service its customers' parts and hardware needs." Id. ¶ 200. Despite Fabtech's protests to the contrary, see Fabtech MTD at 14 ("[N]owhere in the Amended Complaint have Plaintiffs' alleged that its [sic] customer information is a trade secret . . . ."), such information need not be a trade secret, LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 500–02 (S.D.N.Y. 2002) ("[T]he doctrine of unfair competition has been applied in various

situations . . . where a plaintiff alleges misappropriation of information that does not rise to the level of misappropriation of trade secrets or ideas.").

The Court agrees with Defendants, however, that the tooling cannot serve as a basis for an unfair competition claim because it "never left Ramsey's facilities," Hart MTD at 12; Fabtech MTD at 6; see also Am. Compl. ¶¶ 14 (stating that the tooling is located in Kingston, New York, the site of Charles Ramsey's manufacturing facility); 141 (stating that the Charles Ramsey facility houses the tooling), and thus, was never used by Defendants in an unfairly competitive manner. However, the other forms of information that the Harts allegedly took from Charles Ramsey can form the basis of an unfair competition claim. The terms of a business' contractual relationships with each of its counterparties is the type of "customer information not easily obtainable elsewhere" that the law of unfair competition is meant to protect. See Advanced Magnification, 522 N.Y.S.2d at 289. The methods—proprietary, confidential information—are too.[14]

The Harts "misappropriated" this information by allegedly using it without authorization, in breach of their fiduciary duty and duty of confidentiality to Charles Ramsey. See Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993) (recognizing that unfair competition claims can be based upon "breaches of confidential relationships" and "breaches of fiduciary duties"). They

_____

[14]  The Court confesses to some uncertainty, based on the allegations in the Amended Complaint, as to whether the methods could be utilized separately from and without Charles Ramsey's specific tooling. See Am. Compl. ¶¶ 148–49 ("Trout spearheaded the development of a variety of novel processes and methods of application and employment of existing, altered and new tooling (hereinafter, the 'Methods'). These Methods include, but are not limited to, certain jig creation and replication . . . which achieved cost savings, efficiency and quality improvements in the disc polishing process for Hannay."). However, because the methods were evidently useful in meeting Hannay's demands, and Hannay—not being a piano manufacturer— did not require use of the specific patterns and jigs Charles Ramsey used to manufacture piano parts, the Court believes it is reasonable to infer that the methods were more generally applicable in the manufacturing process than for the mere production of piano parts.

did it to benefit, and in cahoots with, Fabtech, the "sham company owned and/or managed by one or more" of their "associates." Am. Compl. ¶ 123; see also Am Compl. ¶ 199. This alone states an unfair competition claim, but Ramsey also alleges that the Harts and Fabtech acted to usurp Charles Ramsey's business, stating that Fabtech attempted to rent Charles Ramsey's old facility and obtain Charles Ramsey's tooling and machinery. Am. Compl. ¶¶ 142–44; see also Innoviant, 390 F. Supp. 2d at 194 ("The New York law of unfair competition . . . prohibit[s] the unauthorized taking and exploitation of internal, proprietary information to assist an employee in competing with a former employer."). Further, the Amended Complaint is replete with allegations of bad faith, including that the Harts sabotaged Charles Ramsey's business and, with Fabtech, cheated Charles Ramsey of hundreds of thousands of dollars. See, e.g., Am. Compl. ¶ 156. These allegations state a claim for unfair competition. See Quadrille Wallpapers & Fabric, Inc. v. Pucci, No. 10-CV-1394, 2011 WL 3794238, at *5 (N.D.N.Y. Aug. 24, 2011) (Kahn, J.) (upholding an unfair competition claim where defendant "alleged[ly] breach[ed] the confidential relationship that she had with" her employer by using her employer's designs and client information to establish a competing business); Am. Bldg. Maint. Co. of New York v. Acme Prop. Servs., Inc., 515 F. Supp. 2d 298, 311 (N.D.N.Y. 2007) (Kahn, J.) (determining that plaintiff stated a claim for unfair competition by alleging that defendants used plaintiff's customer information "in breach of an agreement, confidence, or duty, or as a result of discovery by improper means").

"Although unfair competition may take many forms, the pivotal question is always the same: whether the conduct complained of is fair or unfair." Astroworks, 257 F. Supp. 2d at 619 (internal quotations and citations omitted). Here, where the Amended Complaint alleges that Charles Ramsey employees colluded with an outside firm to acquire Ramsey's confidential client

and manufacturing information, destroy Ramsey's business, and then establish a competitor company to take over Ramsey's business, the Amended Complaint has sufficiently stated a claim for unfair competition.

Defendants protest that Ramsey's allegations are "generalized," Hart MTD at 15, or "conclusory and speculative," Fabtech MTD at 14. The Court acknowledges that, to the extent many of Charles Ramsey's allegations are made "upon information and belief," they can appear somewhat thin in places. However, "[t]he Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations and other quotation marks omitted). In this case, the details of the Harts' and Fabtech's alleged collusion are necessarily within their sole possession and control, therefore the Court finds that Charles Ramsey's allegations made "upon information and belief" are sufficient to state a claim.

### E. Tortious Interference with Prospective Economic Advantage

"To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015) (internal citations and quotation marks omitted) (citing Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008)).

To satisfy the first element, "the complaint must plead interference with a specific identified business relationship with a third party." Brown Media Corp. v. K & L Gates, LLP,

39

and manufacturing information, destroy Ramsey's business, and then establish a competitor company to take over Ramsey's business, the Amended Complaint has sufficiently stated a claim for unfair competition.

Defendants protest that Ramsey's allegations are "generalized," Hart MTD at 15, or "conclusory and speculative," Fabtech MTD at 14. The Court acknowledges that, to the extent many of Charles Ramsey's allegations are made "upon information and belief," they can appear somewhat thin in places. However, "[t]he Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citations and other quotation marks omitted). In this case, the details of the Harts' and Fabtech's alleged collusion are necessarily within their sole possession and control, therefore the Court finds that Charles Ramsey's allegations made "upon information and belief" are sufficient to state a claim.

### E. Tortious Interference with Prospective Economic Advantage

"To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage—under New York law, a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 261 (2d Cir. 2015) (internal citations and quotation marks omitted) (citing Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008)).

To satisfy the first element, "the complaint must plead interference with a specific identified business relationship with a third party." Brown Media Corp. v. K & L Gates, LLP,

586 B.R. 508, 530 (E.D.N.Y. 2018) (internal quotation marks omitted). For the second element, the alleged interference must be "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." In Touch Concepts, Inc. v. Cellco P'ship, 949 F. Supp. 2d 447, 476 (S.D.N.Y. 2013). The third element, "wrongful means," "requires a plaintiff to show that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort,'" or that the "defendant engage[d] in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" 16 Casa Duse, 791 F.3d at 262 (quoting Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (2004)); see also Brown Media, 586 B.R. at 530 (stating that defendant must "act with a wrongful purpose or use wrongful means"). Where "a defendant has acted with a permissible purpose, such as 'normal economic self-interest,'" the "sole purpose" prong cannot be satisfied. See id. (quoting Carvel). Overall, this element "sets a high bar." Id. As for the fourth element, "[a] plaintiff must . . . establish causation by demonstrating that she would have entered into an economic relationship but for the defendant's wrongful conduct." A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 241 F. Supp. 3d 461, 485 (S.D.N.Y. 2017) (internal quotation marks omitted).

The Court considers Charles Ramsey's claims first against the Harts, then against Fabtech.

### 1. The Harts

The Amended Complaint alleges interference with three of Charles Ramsey's specific identified business relationships—those with Steinway, Schaff, and Hannay. See Am. Compl. ¶¶ 210, 213, 216. Charles Ramsey has failed to state a plausible claim for tortious interference against the Harts with respect to the Steinway and Schaff relationships but has stated a claim with respect to the Hannay relationship.

As an initial matter, Charles Ramsey has identified three specific parties with whom it had prospective business relations, thus satisfying the first element. Also, because the allegedly interfering actions comprise the same conduct as that underlying Plaintiffs' breach of fiduciary duty and unfair competition claims, the wrongful means element is satisfied. However, the tortious interference claims against Steinway and Schaff fail on the second element.

Beginning with Steinway, Ramsey has failed to plausibly allege that the Harts' took wrongful actions *directed at* that company. See Puebla Palomo v. DeMaio, 403 F. Supp. 3d 42, 64 (N.D.N.Y. 2019) ("[Interfering] conduct must be "directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.") (citing Carvel, 818 N.E.2d at 1104). The only examples of conduct by the Harts directed toward Steinway consist of Vincent Hart's 2001 fax purporting to list Steinway tooling currently in Charles Ramsey's possession, Am. Compl. ¶¶ 48–49, and Jeremiah Hart's involvement in pricing negotiations with Steinway starting around 2010, Am. Compl. ¶ 59. But neither of these actions appear to have interfered with Charles Ramsey's prospective business relationship with Steinway, as that relationship continued for years after these events transpired.

Ramsey's allegations of interfering conduct directed at Schaff are even thinner. In fact, the full extent of the allegations is that, "in order to redirect Steinway, Schaff and Hannay away from Charles Ramsey, Vincent Hart and Jeremiah Hart misrepresented Charles Ramsey's true condition and capabilities to its customers." Am Compl. ¶ 216. Such a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," is insufficient to plausibly state a claim. Iqbal, 556 U.S. at 678.

The Amended Complaint does contain numerous allegations that the Harts' misrepresentations caused Charles Ramsey to "slow production" and "fire employees," thereby

negatively impacting Ramsey's relationships with its customers. See Opp'n to Hart MTD at 19 (citing, inter alia, Am Compl. ¶¶ 75, 77, 79, 97–106, 115–18, 126–27, 156). But these alleged misrepresentations were directed at Trout, not Steinway or Schaff. See, e.g., Am Compl. ¶ 75 ("Jeremiah Hart did not keep Plaintiff Trout informed in real-time of the decline in purchase orders . . . ."). They cannot then form the basis for a tortious interference claim. See Brown Media, 586 B.R. at 530–31 (dismissing tortious interference claim in part because defendants' "conduct was not directed at the Debtors, which is the third party whose relationship with [plaintiffs] was allegedly damaged by their actions; it was directed at [plaintiff] himself.").[15]

By contrast, Ramsey has alleged conduct by the Harts directed at Hannay, including ignoring certain Hannay orders, Am. Compl. ¶¶ 99–102, "represent[ing] to Hannay that Charles Ramsey was experiencing significant 'business problems,'" id. ¶ 105, and "represent[ing] to Hannay that Jeremiah Hart had resigned from Charles Ramsey," id. ¶ 106. These allegations satisfy the second element of a tortious interference claim.

Furthermore, because the Harts' underlying wrongful conduct allegedly caused the interference with Ramsey's business relationship with Hannay, the fourth element is thereby satisfied as well. According to the letter sent from Hannay to Trout in July 2017, Hannay chose to wind down its business relationship with Charles Ramsey because of three newly-emerged conditions at Ramsey: (1) instability in personnel, (2) inconsistency in deliveries and quality, and

---

[15] Causation, element four, also presents a problem with regard to Steinway and Schaff. The Amended Complaint alleges that Steinway and Schaff, "suddenly and without warning or precursor" demanded that Charles Ramsey "remit" the tooling to them, thus signaling that Steinway and Schaff would no longer engage Ramsey to manufacture their piano parts. Am Compl. ¶¶ 107–08. Other than the general allegation that the Harts "misrepresented Charles Ramsey's true condition and capabilities to" Steinway and Schaff, Am. Compl. ¶ 216, the Amended Complaint contains no allegations that Steinway's or Schaff's sudden demand stemmed from any action by the Harts, see generally Am. Compl.

(3) Hannay's outsized share of Ramsey's business. Am Compl., Ex. 7. Hannay sent the letter, which began the termination of the Ramsey-Hannay business relationship, after speaking with Jeremiah Hart, thus suggesting that Jeremiah's statements during that conversation precipitated the sending of the letter. Id. (sending the letter "after speaking with [Jeremiah] Hart about order status a couple days ago"). Moreover, the Harts were responsible for the specific conditions complained of in the letter. Deliveries were inconsistent because the Harts had ignored certain Hannay orders in the summer of 2017, Jeremiah's misrepresentation to Hannay's president that he had resigned contributed to Hannay's impression of "instability in personnel" at Charles Ramsey, and Jeremiah's comment that Ramsey was undergoing "significant business problems" contributed to Hannay's sense that it occupied an outsized portion of Ramsey's business. Am. Compl. ¶¶ 99–102, 105–06. Under the circumstances, Ramsey has plausibly alleged that the Harts' actions caused Hannay to cease doing business with Ramsey.

For these reasons, the Court dismisses the tortious interference claim against the Harts as to interference with Ramsey's prospective business relations with Steinway and Schaff but denies the motion to dismiss as to Ramsey's relations with Hannay.

### 2. *Fabtech*

For reasons similar to those explained just above regarding Steinway and Schaff, Plaintiff's tortious interference claim against Fabtech fails. The Amended Complaint contains even less support for its interference allegations against Fabtech than it does against the Harts. The extent of the allegations against Fabtech are that "Fabtech . . . participated in redirecting Steinway, Schaff, and Hannay away from Charles Ramsey and to Fabtech," and "Fabtech . . . sought to sabotage Charles Ramsey's business in order to enrich [itself]." Am. Compl. ¶¶ 215, 218. Such allegations contain insufficient factual content to rise above the speculative into the

realm of the plausible. See Iqbal, 556 U.S. at 678. Therefore, the Court dismisses Plaintiffs' tortious interference claim against Fabtech.

### F. Money Had and Received

"A cause of action for 'monies had and received' is an equitable claim similar in theory to unjust enrichment." Brewer v. Vill. of Old Field, 311 F. Supp. 2d 390, 405. This cause of action "seeks to recover under a contract implied by law," and "creates an obligation 'in the absence of agreement when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another.'" Panix Promotions, Ltd. v. Lewis, No. 01-CV-2709, 2002 WL 122302, at *2–3 (S.D.N.Y. Jan. 22, 2002) (quoting Parsa v. State of New York, 64 N.Y.2d 143, 148 (1984)). "Having money that rightfully belongs to another[] creates a debt; and wherever a debt exists without an express promise to pay, the law implies a promise." Goel v. Ramachandran, 975 N.Y.S.2d 428, 437 (2013). "The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." Marini v. Adamo, 995 F. Supp. 2d 155, 206 (E.D.N.Y. 2014), aff'd, 644 F. App'x 33 (2d Cir. 2016), and aff'd, 644 F. App'x 33 (2d Cir. 2016) (citing Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n, 731 F.2d 112, 125 (2d Cir.1984)). The action "has been permitted where plaintiff has paid money by mistake, money has been collected for an illegal tax or assessment, or property is erroneously taken or withheld by a public official." Parsa, 64 N.Y.2d at 148 (citing examples of actions for money had and received).

As an initial matter, there appears to be some confusion over which cause of action Charles Ramsey actually alleges. In the Amended Complaint, Charles Ramsey styles this claim

as one for "Money Had and Received," but it then lists the elements for a tortious interference with contract claim. Am. Compl. ¶ 224. Additionally, the case Ramsey cites discusses tortious interference with contract but makes no mention of money had and received. Id. (citing Dome Prop. Mgmt., Inc. v. Barbaria, 850 N.Y.S.2d 208, 209 (2008)). The Harts recognize this, addressing this section of their briefing to a tortious interference with contract claim, not a money had and received claim. See Hart MTD at 17–19. Despite having this discrepancy brought to its attention by the Harts' motion, Ramsey argues that the Harts "confuse Count V of the Complaint as a claim for intentional interference with contract, although it is clearly labelled "Money Had and Received." Opp'n to Hart MTD at 19. The Opposition then goes on to properly describe—and cite support for—a claim for money had and received. Id. at 19–20.

In any event, Charles Ramsey has failed to state a claim for money had and received. The Amended Complaint contains no allegation that the Harts received money rightfully belonging to Charles Ramsey. See generally Am. Compl. Nor does Ramsey's Opposition argue otherwise, focusing instead on the Harts' alleged actions to "induce[], urge[], convince[] and direct[] Steinway, Schaff, and Hannay to terminate their contracts with Charles Ramsey." Opp'n to Hart MTD at 20. Though the Opposition goes on to say that the Harts did this "to enrich themselves," id., inducing the termination of a contract in order to make a buck is different from receiving money that rightfully belongs to another by mistake. It appears that Charles Ramsey is, once again, confusing a claim for money had and received with one for tortious interference with contract. Because the Amended Complaint fails to identify any money belonging to Charles Ramsey that was erroneously paid to the Harts, the Court dismisses the money-had-and-received count for failure to state a claim. See Lebovits v. Bassman, 992 N.Y.S.2d 316, 318 (2014) (affirming dismissal of claim for money had and received where "the plaintiff did not identify

any corpus of funds that belonged to him or [his company], or which was supposed to be paid to him or [his company] but was instead paid to [defendant].").

### G. Conspiracy to Misappropriate Trade Secrets

"[C]ivil conspiracy is not an independent tort under New York law." <u>Chrysler Capital Corp. v. Century Power Corp.</u>, 778 F. Supp. 1260, 1267 n.8 (S.D.N.Y. 1991) (citing <u>Grove Press, Inc. v. Angleton</u>, 649 F.2d 121, 123 (2d Cir. 1981)). Instead, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." <u>Alexander & Alexander of New York, Inc. v. Fritzen</u>, 503 N.E.2d 102, 103 (1986). Thus, a plaintiff "may plead the existence of a conspiracy to demonstrate that each defendant's conduct was part of a common scheme by demonstrating *the underlying tort* and the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." <u>Am. Bldg.</u>, 515 F. Supp. 2d at 318 (Kahn, J.) (internal quotation marks omitted) (emphasis added). Ramsey's conspiracy claim fails because it has not plausibly alleged an underlying New York law tort claim for misappropriation of trade secrets.

As an initial matter, the Amended Complaint does not purport to state an independent state law claim for misappropriation of trade secrets, <u>see generally</u> Am. Compl, but the Court assumes that Charles Ramsey intended to allege such a claim as the predicate for the conspiracy count. In any event, a claim for misappropriation of trade secrets under New York law fails for the same reason as Plaintiffs' DTSA claim: namely, the Amended Complaint does not sufficiently describe the efforts Plaintiffs took to keep the alleged "trade secrets" secret.

"The requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law."[16] ExpertConnect, 2019 WL 3004161, at *7; see also Medidata, 2018 WL 6173349, at *3 (same). "For a party to succeed on a claim for the misappropriation of trade secrets under New York law, it must demonstrate '(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as the result of discovery by improper means.'" Elsevier, 2018 WL 557906, at *3 (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 117 (2d Cir. 2009)); see also Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1223 (W.D.N.Y. 1994) ("A party claiming trade secret misappropriation must first show that [s]he in fact possessed a trade secret and, second, that such secret was improperly taken from h[er]."). To determine whether particular information qualifies for trade secret protection, New York courts "generally consider the following factors . . . : (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Universal Processing, 2018 WL 4684115, at *3.

"These factors reflect the understanding that the 'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'" Broker Genius, 280 F. Supp. 3d at 514 (quoting Lehman v. Dow Jones & Co., 783 F.2d 285, 298

---

[16] The Court provides the following discussion because the requirements, though similar, are not identical.

(2d Cir. 1986)); see also Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1013 (1993) ("[A]

trade secret must first of all be secret."); Atmospherics, Ltd. v. Hansen, 702 N.Y.S.2d 385, 386

(2000) ("[T]he element of secrecy" is the "essential prerequisite to legal protection against the

misappropriation of a trade secret."). "Courts' references to secrecy encompass two separate, but

related, concepts: (1) the 'substantial exclusivity of knowledge of the formula, process, device or

compilation of information,' and (2) 'the employment of precautionary measures to preserve

such exclusive knowledge by limiting legitimate access by others' so that, 'except by the use of

improper means, there would be difficulty in acquiring the information.'" Broker Genius, 280 F.

Supp. 3d at 514 (quoting Delta Filter Corp. v. Morin, 485 N.Y.S.2d 143, 144 (3d Dep't 1985)).

In order to establish ownership of trade secrets then, a plaintiff must adequately describe

in its pleadings the "precautionary measures" it took to keep secret its proprietary information.

See Broker Genius, 280 F. Supp. 3d at 517 (S.D.N.Y. 2017) ("Even if [plaintiff's information is]

not [a] matter[] of public knowledge or general knowledge in the industry, [it] can only be [a]

trade secret if [plaintiff] employed some precautionary measures to preserve [plaintiff's]

exclusive knowledge by limiting legitimate access by others.") (citing Delta Filter, 485 N.Y.S.2d

at 144); Mastercraft Decorators, Inc. v. Orlando, 356 F. Supp. 3d 259, 270 (W.D.N.Y. 2018)

("Although a plaintiff need not disclose its secrets in order to state a claim, it must allege facts

sufficient to show that the information in fact is secret—for example by disclosing the measures

it took to protect the secrecy of the information."); Xavian, 2019 WL 1620754, at *5 ("[U]nder

the common law of New York . . . 'the courts require that the possessor of a trade secret take

reasonable measures to protect its secrecy.'" (quoting Defiance Button Mach. Co. v. C&C Metal

Products Corp., 759 F.2d 1053, 1063 (2d Cir. 1985) (internal citation omitted)). "Precautionary

measures [can] include, for example, the use of confidentiality agreements, password-protection,

sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality." Mastercraft, 356 F. Supp. 3d at 270 (citing Continental Industries Group, Inc. v. Altunkilic, 14-CV-790, 2018 WL 1508566 (S.D.N.Y. Mar. 27, 2018)).

Ramsey's state law misappropriation claim fails on this second prong of the test for secrecy because it has failed to sufficiently allege that it took precautionary measures to keep its purported trade secrets safe. As noted above in the discussion of Plaintiffs' DTSA claim, the sole allegations in the Amended Complaint concerning what measures Plaintiffs took to keep their proprietary information secret are that "Trout repeatedly indicated to Charles Ramsey's employees that the Methods were critical to Charles Ramsey's ability to maintain its accounts . . ." and that "Trout also reiterated that the Methods constituted sensitive information and provided Charles Ramsey with the economic edge necessary to maintain its business." Am. Compl. ¶¶ 153–54. These barebones allegations are insufficient to establish trade secret ownership under New York law. See Mastercraft, 356 F. Supp. 3d at 270 (dismissing complaint that failed to allege steps taken to keep information secret other than maintaining employee handbook advising that information concerning customers is "confidential"); Thayil v. Fox Corp., No. 11-CV-4791, 2012 WL 364034, at *5 (S.D.N.Y. Feb. 2, 2012) (allegations that plaintiff "considered [the Marketing Plan] to be a trade secret and that the Marketing Plan was provided to defendants as a trade secret" insufficient "to allege that [plaintiff] protected the Marketing Plan in a way that is consistent with the protection of a trade secret"); Hancock v. Essential Resources, Inc., 792 F. Supp. 924 (S.D.N.Y. 1992) (holding that customer materials did not constitute trade secret where plaintiff "imposed no restrictions or guidelines" concerning the circulation of customer lists among employees).

49

Because the Amended Complaint does not plausibly allege that Ramsey owns any trade secrets under New York law, it cannot state a claim for misappropriation of trade secrets. And because the Amended Complaint does not therefore sufficiently allege this underlying tort, there is no corresponding conspiracy claim. For this reason, the Court dismisses this count of the Amended Complaint.

## H. Fraud

"To state a claim for fraud under New York law, a plaintiff must allege 'misrepresentation or concealment of a material fact, falsity, scienter by the wrongdoer, justifiable reliance on the deception, and resulting injury.'" Am. Bldg., 515 F. Supp. 2d at 320 (Kahn, J.) (quoting Zanett Lombardier, Ltd. v. Maslow, 815 N.Y.S.2d 547, 548 (1st Dep't 2006). "In addition to meeting the Rule 12(b)(6) plausibility pleading standard, a party alleging fraud is also required to satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b)," which requires that fraud be pled with particularity. Dynamic Energy Sols., LLC v. Pinney, 387 F. Supp. 3d 176, 191 (N.D.N.Y. 2019) (citing Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015)) (internal citations and quotations marks omitted). Rule 9(b)'s particularity requirement mandates that a plaintiff "'(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)). Additionally, while "mental states may be pleaded 'generally,' [p]laintiffs must nonetheless allege facts 'that give rise to a strong inference of fraudulent intent.'" Loreley, 797 F.3d at 173 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290–91 (2d Cir. 2006)). This can

be accomplished "'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Eternity, 375 F.3d at 187 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). "In determining the adequacy of [a] fraud pleading[] under these various requirements, [the Court] view[s] the alleged facts in their totality, not in isolation." Loreley, 797 F.3d at 171.

Charles Ramsey alleges[17] that Fabtech and the Harts colluded to fraudulently bill Ramsey for "items that were not, in fact, manufactured and produced by Fabtech," Am. Compl. ¶ 258, but that "Charles Ramsey itself manufactured," Id. ¶ 120; see also id. ¶ 124 ("Fabtech did not provide the items for which it billed Charles Ramsey and was paid by Charles Ramsey."). Ramsey also alleges that when Jessica Trout confronted Jeremiah Hart about the Fabtech invoices in an October 20, 2016 email, Jeremiah attempted to cover up the scheme by vouching for Fabtech:

> I verbally tell this company and monitor every item for sure[.] No problem making hard copies going forward. This company hand delivers all hardware with zero shipping costs which is a huge savings in itself[,] not to mention costs are significantly lower than all current supplier[s] and [they] do work we are unable to do due to high tech CNC and 5 axes machining of new hardware . . . . [W]as glad to find these guys. Blessing. . . .

Am. Compl., Ex. 4. Additionally, Ramsey alleges that Jeremiah Hart "committed independent acts of fraud against Charles Ramsey," including: (a) selling Charles Ramsey's excess metal as scrap and pocketing the proceeds; (b) failing to show up for work without taking sick days or vacation days; and (c) ceasing to send "regular financial statements and receipts" to Trout's New Jersey office in an effort to dupe Trout into awarding Jeremiah a performance bonus. Am.

---

[17] Because the Court has already dismissed Trout's fraud claim for lack of standing, it refers only to Charles Ramsey's fraud claim throughout this section.

Compl. ¶ 266. With regard to the fraudulent billing and Jeremiah's alleged cover-up, Ramsey has plausibly pled a particularized fraud claim; with regard to Jeremiah Hart's "independent acts" of fraud, they have not.

### 1. Fraudulent Billing and Cover-Up

First, as to the fraudulent invoicing scheme, Charles Ramsey has stated a plausible claim against both Fabtech and the Harts. Ramsey alleges that the Harts and Fabtech knowingly and intentionally engaged in a scheme to submit false invoices to Charles Ramsey—billing Ramsey for goods that Fabtech did not supply—and that Ramsey relied on these invoices in paying out to Fabtech over $240,000. Am Compl. ¶¶ 120–28, 250–65. Ramsey further alleges that it engaged in these transactions with Fabtech because it relied on misrepresentations by the Harts that "Fabtech was providing items which Charles Ramsey required and did not produce," id. ¶ 252, and Jeremiah Hart's statements about Fabtech in the October 20, 2016 email exchange with Jessica Trout, id. ¶ 256. These allegations satisfy the elements of common law fraud in New York. See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395, 402 (2d Cir. 2015) ("To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.").

Charles Ramsey has also satisfied FRCP 9(b)'s particularity requirement. Exhibit 2 to the Amended Complaint details in chart form all the Fabtech invoices that Charles Ramsey paid from 2014 to 2017, including the amount and date paid. See Am. Compl., Ex. 2. Because attached exhibits are incorporated into a complaint, see Mitchell, 2019 WL 2479611, at *3, the

Amended Complaint thus describes the allegedly fraudulent statements,[18] identifies the speakers, states that date of payment, and explains why the statements were false.[19] <u>See</u> Am. Compl. ¶¶ 120–28, 250–65, Ex. 2; <u>see also</u> <u>Elsevier Inc. v. Memon</u>, 97 F. Supp. 3d 21, 30–31 (E.D.N.Y. 2015) (complaint satisfied FRCP 9(b)'s particularity requirement where it described the nature of the scheme and "contain[ed] a chart listing names and years of the [items] that were purchased by each . . . [d]efendant in furtherance of their scheme"). Such allegations adequately "serve[] [Rule 9(b)'s] purpose by apprising the defendant . . . of the nature of the claim and the acts or statements . . . relied upon by the plaintiff as constituting the fraud being charged." <u>United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.</u>, 865 F.3d 71, 86–87 (2d Cir. 2017); <u>see also</u> <u>Int'l Motor Sports Grp., Inc. v. Gordon</u>, No. 98-CV-5611, 1999 WL 619633, at *3 (S.D.N.Y. Aug. 16, 1999) ("[A] plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.") (internal quotation marks omitted). "Rule 9(b) requires nothing more." <u>Chorches</u>, 865 F.3d at 87; <u>see also</u> <u>United States v. N. Adult Daily Health Care Ctr.</u>, 205 F. Supp. 3d 276, 285 (E.D.N.Y. 2016) (stating that whether a complaint satisfies Rule 9(b) depends upon, inter alia, "how much circumstantial detail is necessary to give notice to the adverse party and enable [her] to prepare a responsive pleading").

Additionally, Charles Ramsey has plausibly pled scienter by "alleging facts to show that defendants had both motive and opportunity to commit fraud," <u>Eternity</u>, 375 F.3d at 187. The Amended Complaint alleges motive by describing how Defendants schemed to embezzle money

---

[18] The fraudulent statements consist of the invoices, sent to Ramsey's Kingston facility by Fabtech and vouched for there by the Harts.

[19] The statements were false because Fabtech did not ship the items for which it billed Charles Ramsey and which the Harts claimed Ramsey needed to purchase.

from Charles Ramsey in order to "enrich themselves." <u>See</u> Am. Compl. ¶ 128, 193, 218. It also alleges opportunity by describing how Trout's role as an "absentee" owner, <u>id.</u> ¶ 26, and his "hands off" management style, Am. Compl., Ex. 8, allowed the Harts to induce Ramsey into allegedly fraudulent transactions with Fabtech. These allegations "provide the strong inference of fraudulent intent necessary under Rule 9(b)." <u>On-Line Techs. v. Perkin Elmer Corp.</u>, 141 F. Supp. 2d 246, 260 (D. Conn. 2001) (internal quotations omitted). That Ramsey relies on certain allegations made "upon information and belief" does not alter this conclusion where, as here, "the matter alleged is peculiarly within the knowledge of the defendant." <u>Watts v. Jackson Hewitt Tax Serv. Inc.</u>, 579 F. Supp. 2d 334, 351 (E.D.N.Y. 2008) (declining to dismiss fraud claim where allegations in complaint were "based on a combination of information and belief and the investigation of counsel").

Defendants' arguments to the contrary do not alter the Court's decision. The Harts argue that "it defies belief that Trout could be so unknowledgeable about his own company's manufacturing activity that he could fall prey to the Harts [sic] alleged misrepresentations." Hart MTD at 22. But such an argument is inapposite at the motion to dismiss stage, where a complaint's allegations are assumed true. Moreover, the Court finds it plausible that an "absentee" owner who had relied for years on his on-site "vice president of operations" might not have knowledge of the details of his own company's manufacturing activities. Such a policy may not have been wise, but it is plausible. In turn, Fabtech argues that "Plaintiff alleges generally that the invoices provided by Fabtech were false or misrepresented, but fails to identify specific statements or figure within the invoices that . . . are fraudulent." Fabtech MTD at 20. But this argument misunderstands Charles Ramsey's allegations, which are not that certain figures or statement within the invoices were fraudulent but that Fabtech invoiced Ramsey for goods that it

never shipped. <u>See</u> Am Compl. ¶ 124 ("Upon information and belief, Fabtech did not provide the items for which it billed Charles Ramsey . . . ."). Charles Ramsey's allegations are thus that the invoices as a whole are fraudulent, and Fabtech's sending of the invoices was itself a fraudulent act. Fabtech's protests that Ramsey's allegations fail to satisfy FRCP 9(b)'s particularity requirement are unavailing.

For the above reasons, the Court denies Defendants' motions to dismiss Charles Ramsey's fraud claim based on fraudulent billing.

### 2. "Independent" Acts of Fraud

However, Charles Ramsey has failed to state a claim against Jeremiah Hart for his: (a) unauthorized sales of Ramsey's scrap metal; (b) failure to take sick and vacation time on days when he did not show up for work; and (c) decision to stop sending Trout financial statements. Am. Compl. ¶ 266. Even assuming these thin allegations satisfy the elements of common law fraud in New York, none of these three bases have been pled with particularity. The Amended Complaint contains no information about when Jeremiah Hart sold Ramsey's excess metal, failed to show up at work without taking a sick or vacation day, or stopped sending financial statements to Trout.[20] Nor does it detail any particular fraudulent statements made in connection with these allegations. And, at least with regard to the scrap metal sales, there is no information about where the alleged unauthorized sales took place. While these allegations may support a claim for breach of fiduciary duty, they are insufficiently particularized to state a claim for fraud.

---

[20] The Amended Complaint does state that Jeremiah stopped sending the financial statements in 2016. Am. Compl. ¶ 216. However, alleging a year-long window in which an event took place does not satisfy FRCP 9(b). <u>See</u> <u>Skylon Corp. v. Guilford Mills, Inc.</u>, No. 93-CV-5581, 1997 WL 88894, at *2 (S.D.N.Y. Mar. 3, 1997) ("Although plaintiff outlines a four-month window during which all of the misrepresentations occurred, this does not satisfy the pleading standard of Rule 9(b).").

Therefore, the Court dismisses Charles Ramsey's fraud claim to the extent it is based on the three "independent acts" of fraud detailed in Paragraph 264 of the Amended Complaint.

## V.  CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Motions to Dismiss, Dkt. Nos. 26; 31, plaintiff Trout's claims (Counts I and VII) for lack of standing are **DENIED** as to the DTSA claim but **GRANTED** as to the fraud claim; and it is further

**ORDERED**, that Vincent and Jeremiah Harts' Motion to Dismiss, Dkt. No. 31, for failure to state a claim upon which relief can be granted is **GRANTED** as to Plaintiffs' DTSA claim (Count I), the tortious interference with prospective business advantage claim as regards Ramsey's relationship with Steinway and Schaff (Count IV), the money had and received claim (Count V), the conspiracy to misappropriate trade secrets claim (Count VI), and the fraud claim (Count VII) based upon Jeremiah Hart's "independent acts" of fraud; and it is further

**ORDERED**, that Vincent and Jeremiah Harts' Motion to Dismiss, Dkt. No. 31, for failure to state a claim upon which relief can be granted is **DENIED** as to the breach of fiduciary duty claim (Count II), the unfair competition claim (Count III), the tortious interference with prospective business advantage claim as regards Ramsey's relationship with Hannay (Count IV), and the fraud claim (Count VII) based on the Harts' and Fabtech's alleged fraudulent billing scheme; and it is further

**ORDERED**, that Fabtech's Motion to Dismiss, Dkt. No. 26, for failure to state a claim upon which relief can be granted is **GRANTED** as to Plaintiffs' DTSA claim (Count I), the conspiracy to misappropriate trade secrets claim (Count VI), and the fraud claim (Count VII) based upon Jeremiah Hart's "independent acts" of fraud; and it is further

**ORDERED**, that Fabtech's Motion to Dismiss, Dkt. No. 26, for failure to state a claim upon which relief can be granted is **DENIED** as to the unfair competition claim (Count III), the tortious interference with prospective business advantage claim (Count IV), and the fraud claim (Count VII) based on the Harts' and Fabtech's alleged fraudulent billing scheme; and it is further

**ORDERED**, that Plaintiffs' DTSA claim (Count I), tortious interference with prospective business advantage claim against Fabtech in toto and against the Harts in part (only with respect to Ramsey's relationship with Steinway and Schaff) (Count IV), money had and received claim (Count V), conspiracy to misappropriate trade secrets claim (Count VI), and fraud claim (Count VII) based upon Jeremiah Hart's "independent acts" of fraud are **DISMISSED without prejudice**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      January 21, 2020
            Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge